**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| **Plaintiff,** | **24 Civ. 9017 (      )** |
| **-against-** | |
| **STEPHEN KENNETH LEECH,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

Plaintiff Securities and Exchange Commission ("Commission" or "SEC"), for its Complaint against Stephen Kenneth Leech ("Leech" or "Defendant"), alleges as follows:

### SUMMARY

1.      Leech, the former co-chief investment officer ("CIO") of Western Asset Management Company, LLC ("Western Asset"), engaged in a years-long fraudulent "cherry-picking" scheme in which he disproportionately allocated better performing trades to certain favored portfolios, and worse performing trades to other portfolios.

2.      From at least January 2021 through October 2023 (the "Relevant Period"), Leech was a named portfolio manager for several investment strategies. In that role, he placed trades in "omnibus" brokerage accounts that combined the trades of multiple Western Asset clients.

3.      Contrary to Western Asset's mandatory training for portfolio managers, Leech did not allocate trades to specific portfolios at or near the time his trades were executed. Instead, he typically allocated trades hours later, often waiting until near or even after the end of the trading day. In the interim, Leech had the opportunity to see whether the market value of his trades went up or down.

4.      As a result, Leech was able to cherry-pick trades, allocating trades with first-day gains to favored portfolios ("Favored Portfolios") and trades with first-day losses to disfavored portfolios ("Disfavored Portfolios").

5.      During the Relevant Period, Leech allocated hundreds of millions of dollars in net first-day gains to Favored Portfolios and hundreds of millions of dollars in net first-day losses to Disfavored Portfolios. The statistical probability that this pattern occurred by random chance is less than one in one trillion.

6.      Although these first-day results were primarily unrealized, first-day gains increased the likelihood that Favored Portfolios would have positive performance. Daily performance was a metric that Western Asset calculated, tracked, and reported internally every day for portfolios managed out of Western Asset's Pasadena headquarters, including the portfolios managed by Leech.

7.      Western Asset's clients were unaware that Leech used first-day performance to allocate trades because he concealed that fact from them.

8.      Meanwhile, Leech stood to profit significantly from his cherry-picking scheme, both professionally and financially. At a time of declining performance at Western Asset, Leech's fraud boosted the returns of a strategy he had started and managed for numerous Favored Portfolios for years. And in March 2023, as Leech accelerated his scheme, he shifted millions of dollars of his own personal investments through his deferred compensation plan to Favored Portfolios.

9.      By engaging in this cherry-picking scheme, Leech effectively stole assets from Disfavored Portfolios and, in doing so, breached the fiduciary duties he owed to his clients and violated the antifraud and other provisions of the federal securities laws.

## VIOLATIONS

10.     By virtue of the foregoing conduct and as alleged further herein, Leech has

violated Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§

77q(a)(1) and (3)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15

U.S.C. §§ 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)],

Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C.

§§ 80b-6(1) and (2)], and Sections 36(a) and 37 of the Investment Company Act of 1940

("Investment Company Act") [15 U.S.C. §§ 80a-35 and 36].

11.     Unless Defendant is restrained and enjoined, he will engage in the acts, practices,

transactions, and courses of business set forth in this Complaint or in acts, practices, transactions,

and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

12.     The Commission brings this action pursuant to the authority conferred upon it by

Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)], Exchange Act Section

21(d) [15 U.S.C. § 78u(d)], Advisers Act Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d) and

80b-9(e)], and Investment Company Act Section 42 [15 U.S.C. §§80a-41(a) and 80a-41(d)].

13.     The Commission seeks a final judgment: (a) permanently enjoining Defendant

from violating the federal securities laws and rules that this Complaint alleges he has violated;

(b) enjoining Defendant from participating, directly or indirectly, in the purchase, offer, or sale

of any security other than for his own personal accounts; (c) ordering Defendant to disgorge all

ill-gotten gains he received as a result of the violations alleged here and to pay prejudgment

interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C.

§§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (d) ordering Defendant to pay civil money penalties

pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)], and Investment Company Act Section 42(e) [15 U.S.C. §80a-41(e)]; (e) ordering that Defendant be permanently prohibited from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (f) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], Advisers Act Section 214 [15 U.S.C. § 80b-14], and Investment Company Act Section 44 [15 U.S.C. §80a-43].

15.     Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

16.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], Advisers Act Section 214 [15 U.S.C. § 80b-14], and Investment Company Act Section 44 [15 U.S.C. § 80a-43] because certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. For example, Leech placed trades with various brokers headquartered in New York, New York, and certain investors in Favored Portfolios and Disfavored Portfolios were located in Westchester and New York counties.

**THE DEFENDANT**

17.     **Leech**, age 70, resides in Pasadena, California. Leech began working at Western

Asset as a portfolio manager in 1990. He served as Western Asset's CIO between 1998 and 2008

and again between 2013 and August 2024. In August 2023, Western Asset named a co-CIO, and

Leech shared Western Asset's CIO responsibilities through August 21, 2024. Since then, Leech

has been on leave from the firm.

**RELATED ENTITY**

18.     **Western Asset** is a limited liability company formed in California, with its

principal place of business in Pasadena, California and an office in Manhattan. Western Asset

has been an SEC-registered investment adviser since 1971 and, as of December 2023, had

approximately $308 billion in assets under management ("AUM").

19.     In particular, Western Asset provides investment management and advisory

services for fixed income portfolios, including broad market portfolios as well as more

specialized and tailored portfolios. Western Asset provides discretionary investment

management services to institutional clients, including corporate and government pension funds,

profit-sharing plans, and foundations. Western Asset is also contracted by registered mutual

funds and private funds to manage their investment portfolios, and by other advisers as a sub-

adviser.

20.     At all times relevant to the Complaint, Western Asset utilized third-party broker-

dealers to execute trades.

## FACTS

### I.    Background

#### A.    Mutual Funds, Private Funds, Separately Managed Accounts, and Investment Advisers

##### 1.    Mutual Funds

21.    A mutual fund is a type of SEC-registered investment company that pools money from many investors and invests the money in some combination of stocks, bonds, short-term money-market instruments, and/or other assets. The securities and other assets owned by a mutual fund are known collectively as the fund's portfolio.

22.    A mutual fund's portfolio is managed by an SEC-registered investment adviser. A mutual fund's investment adviser owes a fiduciary duty to its client, *i.e.* the fund. Each mutual fund share represents an investor's proportionate ownership of the mutual fund's portfolio and of the income and capital gains the portfolio generates.

23.    Investors in mutual funds buy their shares from, and sell or redeem their shares to, the mutual funds themselves. Mutual fund shares are typically purchased from the fund directly or through investment professionals, such as brokers.

24.    The mutual fund advisory fee structure is often based on a percentage of AUM.

##### 2.    Private Funds

25.    A private fund is another type of entity that pools money from multiple investors and invests the money in various securities and other assets.

26.    Private funds may rely on one of the exemptions from the definition of investment company set forth in Section 3 of the Investment Company Act.[1]

---

[1] The Section 3(c)(1) exemption is available to funds that are (i) beneficially owned by not more than 100 persons and (ii) not making nor intending to make a public offering. The Section

27.    Private funds are not registered with the Commission. They are not subject to the Investment Company Act and its associated regulations, which are applicable to mutual funds and other registered investment companies. However, private funds and their advisers are subject to the same prohibitions against fraud as other market participants. Additionally, all investment advisers, including advisers to mutual funds and private funds, owe a fiduciary duty to the funds that they manage.

28.    The private fund advisory fee structure typically includes a management fee (based on AUM), as well as a performance fee (based on the profits of the fund).

### 3.    Separately Managed Accounts

29.    A separately managed account ("SMA") is a portfolio that includes securities or other assets managed by an investment adviser on behalf of an advisory client. Unlike pooled investment vehicles, wherein investors own a share of the fund, the investor in an SMA directly owns the securities or other assets in the portfolio, which is managed by the adviser.

### 4.    Investment Advisers

30.    An investment adviser, under the Advisers Act, includes any person who, for compensation, engages in the business of advising others, such as a mutual fund, private fund, or other client, about investing in securities or the value of securities.

31.    Advisers that manage portfolios provide ongoing advice about buying, selling and/or holding investments and, in the context of an ongoing advisory relationship with a client and unless agreed otherwise, monitor the performance of the client's investments and their alignment with the client's overall investment objectives and best interests.

---

3(c)(7) exemption is available to funds that are (i) owned exclusively by "qualified purchasers" and (ii) not making nor intending to make a public offering. There is no limit to the number of qualified purchasers under this exemption.

32.     An investment adviser to an investment company, under the Investment Company Act, includes a person who regularly furnishes advice to the investment company with respect to the desirability of investing in, purchasing, or selling securities or other property, or who is empowered to determine what securities or other property shall be purchased or sold by such company.

33.     An investment adviser owes a fiduciary duty to clients. This duty includes an affirmative duty of utmost good faith and a duty to act in the best interest of clients, as well as an obligation to provide full and fair disclosure of all material facts and to employ reasonable care to avoid misleading clients.

### B.     Derivatives: Treasury Futures and Options

34.     A derivative is a financial contract that derives its value from the value and performance of some other underlying financial instrument or variable, such as an index or interest rate. Derivative contracts include futures and options.

35.     A Treasury futures contract is an agreement to buy or sell U.S. government notes or bonds at a specific price and date in the future. The U.S. government issues bonds and notes for fixed terms (*e.g.*, 2-year, 5-year, 10-year, and 30-year terms) at fixed interest rates. U.S. Treasury bonds trade around the clock leading to constant price fluctuations.

36.     An option is the right to buy or sell a specified amount or value of a particular underlying interest at a fixed exercise price by exercising the option before its specified expiration date. An option that gives the right to buy is a call option, and an option that gives a right to sell is a put option. Both call options and put options specify an expiration date.

### C.    Western Asset's Investment Strategies

### 1.    Macro Opps, Core, and Core Plus

37.    During the Relevant Period, Western Asset employed multiple investment strategies for its portfolios, including (a) the Western Asset Macro Opportunities strategy ("Macro Opps"); (b) the Western Asset US Core strategy ("Core"); and (c) the Western Asset US Core Plus strategy ("Core Plus") (collectively, the "Strategies").

38.    The portfolio clients within the Strategies included mutual funds and other registered investment companies ("Registered Funds"), private funds, and other investment funds (collectively with the Registered Funds and private funds, the "Funds"), as well as SMAs.

39.    During the Relevant Period, Funds within each of Macro Opps, Core, and Core Plus had billions of dollars in subscriptions and redemptions.

40.    Macro Opps was a macro-oriented, global strategy that did not adhere to a specific benchmark. As a result, the success of Macro Opps was measured, in part, against its own prior performance, or its "total return."

41.    At times during the Relevant Period, Macro Opps had more than $13 billion in AUM. As of June 30, 2024, Macro Opps had approximately $2.1 billion in AUM across multiple portfolios, the largest of which was a mutual fund called the Western Asset Macro Opportunities Fund (Ticker: LAOIX) (the "Macro Opps Mutual Fund").

42.    During the Relevant Period, the Macro Opps Mutual Fund had billions of dollars in subscriptions and redemptions.

43.    As of the close of the market on October 29, 2024, Macro Opps ceased operating, and the strategy's assets were liquidated.

44.     Core and Core Plus are U.S. broad market strategies with benchmarks tied to the Bloomberg US Aggregate Index.

45.     At times during the Relevant Period, Core had more than $44 billion in AUM. As of June 30, 2024, Core had $31.1 billion in AUM across multiple portfolios, the largest of which was a mutual fund called the Western Asset Core Bond Fund (Ticker: WATFX) (the "Core Mutual Fund").

46.     During the Relevant Period, the Core Mutual Fund had billions of dollars in subscriptions and redemptions.

47.     At times during the Relevant Period, Core Plus had more than $122 billion in AUM. As of June 30, 2024, Core Plus had $66.8 billion in AUM across multiple portfolios, the largest of which was a mutual fund called the Western Asset Core Plus Bond Fund (Ticker: WACPX) (the "Core Plus Mutual Fund").

48.     During the Relevant Period, the Core Plus Mutual Fund had billions of dollars in subscriptions and redemptions.

49.     Favored Portfolios primarily included portfolios in the Macro Opps strategy, whereas Disfavored Portfolios primarily included portfolios in the Core and Core Plus strategies.

50.     In many respects, the Macro Opps and Core and Core Plus strategies were similar.

51.     For example, the asset classes in the Strategies included cash securities and related derivatives, including Treasuries and Treasury derivatives, investment grade corporate bonds, high yield bonds, and mortgage-backed securities.

52.     As a result, investment opportunities suitable for Macro Opps were frequently also suitable for Core or Core Plus.

## 2. Leech's Role in the Strategies and Focus on Macro Opps' First-Day Performance

53.    During the Relevant Period, Leech managed billions of dollars in clients' assets across more than a dozen portfolios in each of Macro Opps and Core Plus, as well as several portfolios in Core. These portfolios included Registered Funds, other Funds, and SMAs.

54.    Western Asset formed the Core strategy in 1989, before Leech joined the firm.

55.    Western Asset launched Core Plus in 1993, when Leech was at the firm, but Leech did not form the strategy.

56.    During the Relevant Period, Leech was part of a team of multiple portfolio managers for Core and Core Plus.

57.    In 2012, Leech formed the Macro Opps strategy. Leech was Macro Opps' lead portfolio manager from inception and throughout the Relevant Period.

58.    As lead portfolio manager of Macro Opps, Leech was responsible for the development of the strategy and day-to-day oversight of the strategy's investments.

59.    Macro Opps had another portfolio manager who could trade for portfolios in the strategy, but who typically did not do so on a daily basis.

60.    By comparison, Leech typically placed dozens of trades per day many of which he allocated to Macro Opps portfolios.

61.    Leech supervised a team of personnel who worked on Macro Opps, including, among others, a trader, a portfolio analyst, and risk personnel.

62.    Leech's Macro Opps team generated a daily report tracking the performance of a private fund in the Macro Opps strategy that it used as a metric for overall strategy performance.

63.    The report contained a daily performance attribution for each asset class in the fund.

64.     Leech's team circulated this report to Leech and others on the Macro Opps team daily, with an email subject line that typically highlighted a basis point measure of the increase or decrease in the fund's net asset value ("NAV") as compared to the prior day.

65.     Leech himself also emphasized the importance of daily performance in Macro Opps in communications with his team, by commenting, for instance, on the need for an "up day" or "positive score"—which referred to a portfolio's day-over-day performance—and sharing his observations of day-over-day results.

66.     Leech referred to positive daily performance as a "plus score."

67.     Because Macro Opps was not benchmarked to an outside index like Core and Core Plus were, a "plus score" was a significant way to demonstrate positive strategy performance.

68.     Leech also received daily reports that Western Asset circulated to portfolio managers, which detailed the daily performance of various assets in the portfolios managed by Leech and other portfolios managers.

69.     Further, because Leech viewed investors in Macro Opps as quick to redeem in a challenging environment, demonstrating positive performance in Favored Portfolios was particularly important during the Relevant Period.

### 3.    Western Asset's Management and Performance Fees

70.     At all relevant times, Western Asset charged clients management fees based on AUM.

71.     On average, Western Asset charged higher management fees to Macro Opps portfolios than to Core or Core Plus portfolios.

72.     The management fee was between approximately 5 and 45 basis points of portfolio market value for the Core and Core Plus portfolios Leech managed, with the majority of the portfolios paying 30 basis points or less. The management fee was between approximately 40 and 115 basis points of portfolio market value in the Macro Opps portfolios Leech managed, with the majority of the portfolios paying 60 basis points or more.[2]

73.     Western Asset also charged performance fees to certain Macro Opps portfolios Leech managed, but not to any Core or Core Plus portfolios that Leech managed.

74.     Because of this difference in fee structures, each dollar of AUM in Macro Opps portfolios could generate approximately four times as much revenue for Western Asset as each dollar in Core and Core Plus portfolios.

75.     For example, in 2020, for portfolios managed by Leech, Core Plus earned almost $65 million in net revenue on about $58 billion AUM, and Core earned about $26 million in net revenue on about $21 billion AUM. Meanwhile, Macro Opps portfolios managed by Leech earned over $56 million in net revenue on only approximately $14 billion AUM.

76.     The difference in fee structures among the Strategies incentivized Leech to maximize the performance of Macro Opps portfolios to generate more revenue for Western Asset and increase his own bonus compensation, which was tied to the firm's profits.

**D.     Leech Was an Investment Adviser Who Owed a Fiduciary Duty to the Portfolios He Managed.**

77.     At all relevant times, Leech was an investment adviser.

78.     As Western Asset's CIO, Leech led the firm's Investment Management Unit, which focused on the management of client portfolios.

79.     Leech exercised discretion and control over Western Asset's clients' assets.

[2] A basis point is one hundredth of one percent.

13

80.    Leech advised on strategy and investment decisions for over 30 portfolios that were comprised of a broad cross section of securities and other assets from the U.S. and global markets.

81.    Leech received compensation for his services through, among other things, the management fees and performance fees paid by the portfolios.

82.    Leech also was the chair of Western Asset's Global Strategy Committee, the head of the U.S. Broad Strategy Committee, and a member of the firm's Management, Asset Allocation, Global Credit, Mortgage Strategy, and Inflation committees.

83.    He participated in weekly meetings held by each of these committees, and daily strategy meetings at which the Core, Core Plus, and Macro Opps investment teams often discussed and evaluated investment opportunities.

84.    As described in a response to an investor due diligence questionnaire ("DDQ") for Macro Opps, Leech was the strategy's "lead [p]ortfolio [m]anager . . . responsible for the day-to-day strategic oversight of the portfolio's investments and for supervising the operations of the various sector specialists dedicated to the specific asset classes in which [Macro Opps] invests."

85.    As identified in DDQ responses for Core and Core Plus, Leech was a member of the investment management team responsible for the applicable strategy.

86.    For his work as CIO and as a portfolio manager providing investment advice to the portfolios under his management, Leech received compensation from Western Asset in the form of salary, incentive compensation, deferred compensation, and stock.

87.    Leech's incentive compensation was directly related to firm revenue, as after all firm expenses were paid, Leech generally received approximately half of the firm's profits in the form of cash incentive compensation.

**II.    Leech Defied Western Asset's Instructions on Trade Allocation Practices.**

88.    During the Relevant Period, Leech primarily traded in Treasury futures and options on Treasury futures for all of the portfolios he managed across the Strategies.

89.    Leech typically began trading around 5 a.m. Pacific Time ("PT") (*i.e.*, 8 a.m. Eastern Time ("ET")), and traded all day, generally placing dozens of trades per day.

90.    Leech used a Western Asset omnibus account at each broker with whom he placed trades, including brokers headquartered in Manhattan.

91.    In general, an omnibus account allows an investment adviser to buy and sell securities and commodities on behalf of multiple clients without telling the applicable broker the specific client for which a trade is intended at the time of the trade. This was the case for most of the omnibus brokerage accounts used by Leech.

92.    Western Asset instructed its portfolio managers, including Leech, that the best practice was to allocate trades as soon as possible after execution.

93.    For example, Western Asset's compliance department provided mandatory training to investment staff, including Leech and other portfolio managers, stating that trades should be allocated promptly after execution.

94.    In a June 2018 compliance training, Western Asset's Chief Compliance Officer ("CCO") warned employees to finalize "allocations and the trade ticket promptly after the trade execution." He explained, "this is another thing that we know that the regulators are doing, they're looking at time stamps. So, if they get a sense that you executed first thing in the morning, but we didn't allocate until the end of the day, they may come to us … and wonder … 'you only allocated after you saw what the market did.'"

95.    On August 2, 2021, Western Asset's CCO sent an email to investment staff, including Leech, stating that trades should be allocated promptly, and that delayed or late

allocations cause Western Asset to assume unnecessary risk and might require Western Asset "to defend and explain . . . a pattern of market movements and allocations made late in the day."

96.    The email further described that the SEC "is concerned that an adviser might use knowledge of market movement to allocate winning trades to certain accounts," and provided citations to three cases in which the SEC charged investment advisers with engaging in fraudulent cherry-picking schemes.

97.    In a training conducted in June 2022, Western Asset's CCO stated that in going through the daily trade process, employees should finalize trade allocations "promptly after the trade is executed." Then he described the following as a "bad facts scenario": "Let's say you execute that trade at 8am, the market moves, you post that allocation at noon." He further explains, "how do we know whether that allocation posted at noon was influenced by the market move? How do we know that you … saw the market move in a particular way, and you didn't tweak that allocation with that knowledge in your mind? How do you prove it?" Further, he said "the risk that we have is longer the longer the trade sits between execution and posting."

98.    Additionally, Western Asset's electronic trade management system allowed portfolio managers to prepare draft trade tickets and specify an allocation instruction even before placing a trade.

99.    Western Asset's documented trade flow process—which it communicated to at least some investors—purported that the firm's investment professionals would submit draft allocation tickets for compliance review in advance of trade execution.

100.    Most of Western Asset's portfolio managers used its electronic trading system and pre-allocated trades prior to trading and/or allocated trades shortly after they placed a trade, consistent with the firm's instructions and training.

101.  But Leech typically did not use the electronic trading system or specify trade allocations in draft tickets when placing trades.

102.  Instead, Leech predominately placed trades by calling his contacts (*i.e.*, registered representatives) at brokerage firms.

103.  Contrary to Western Asset's training, Leech did not document or communicate intended allocations at the time of his trades.

104.  Instead, for one of the seven brokers that Leech used ("Broker A"), there was a default instruction to allocate Leech's trades to Macro Opps portfolios. However, for the other six brokers Leech used—accounting for approximately 65 percent of his trading during the Relevant Period—there were no default allocation instructions, and Leech had full discretion to allocate trades among any of the portfolios he managed across the Strategies.

105.  As Leech's trades were filled, brokers issued trade confirmations that were typically received on a rolling basis throughout the day by Leech and his dedicated trade assistant ("Trade Assistant A"), as well as by other personnel in Western Asset's trade operations group.

106.  Typically, after Trade Assistant A received numerous trade confirmations, Trade Assistant A would attempt to contact Leech by phone to obtain allocations for his trades.

107.  Trade Assistant A often did not hear back from Leech for several hours.

108.  Accordingly, Leech did not discuss allocations with Trade Assistant A around the time that he placed individual trades, or even as the trades were filled by the brokers with whom Leech had earlier placed trades.

109.  Instead, Leech routinely provided Trade Assistant A his allocations for most of a day's trading activity in a single afternoon phone call at or around 1 p.m. PT (*i.e.*, 4 p.m. ET,

after the settlement price was determined on the Chicago Mercantile Exchange, which sets the daily prices for many of the instruments Leech traded).

110.    In other words, although Leech commenced trading at approximately 5 a.m. PT (*i.e.*, 8 a.m. ET), and brokers filled his trades throughout the day, Leech allocated the majority of his Treasury derivatives trades during the Relevant Period after 1:00 p.m. PT (*i.e.*, 4 p.m. ET).

111.    In the time between when Leech placed trades and when he allocated them, he was able to observe price changes in the relevant instruments using a Bloomberg screen that he had displayed on his computer monitors at his home and in his office.

112.    Even in phone calls with Trade Assistant A that took place hours after a trade was filled, Leech would at times decline to provide allocation instructions and ask Trade Assistant A to come back to him later.

113.    When Leech did finally allocate his trades, his instructions to Trade Assistant A typically fell into three categories: (1) an allocation to Macro Opps, pro rata by market value across the portfolios in that strategy; (2) an allocation to Core and Core Plus, pro rata by market value across the portfolios Leech managed in those strategies; or (3) "50/50" to indicate an allocation of 50% of the dollar value of the trade pro rata by market value across the Macro Opps portfolios and 50% of the dollar value of the trade pro rata by market value across the Core and Core Plus portfolios Leech managed.

114.    While these three allocation categories covered most of Leech's instructions, he occasionally directed Trade Assistant A to make allocations to a particular portfolio in one of the Strategies, or to allocate a particular number of contracts to a particular portfolio, rather than allocating pro rata by market value.

115.  Once Trade Assistant A received allocation instructions from Leech, Trade Assistant A entered each trade in Western Asset's electronic trade management system for processing by Western Asset's back office.

116.  When Trade Assistant A was unavailable, others collected and entered Leech's trade allocations in a similar fashion to Trade Assistant A.

### III.    Leech Engaged in a Fraudulent Cherry-Picking Scheme.

117.    At various times in the Relevant Period, some of the Favored Portfolios held disproportionately large positions in instruments that caused substantial losses, including positions in Russian sovereign debt in the spring of 2022, Credit Suisse Additional Tier 1 bonds ("AT1s")[3] in the spring of 2023 and duration[4] positions that reflected a (mistaken) view that interest rates would decrease rather than increase during the Relevant Period.

118.    Yet, during the Relevant Period, as reflected in Western Asset's trade blotter, Leech allocated more than $600 million of trades at net first-day gains to Favored Portfolios, and more than $600 million of trades at net first-day losses to Disfavored Portfolios.

119.    Statistically, the probability that these differences in first-day returns occurred by random chance is less than one in one trillion.

120.    Leech executed his cherry-picking scheme by placing trades with brokers using Western Asset's omnibus accounts and then waiting to allocate trades to specific portfolios until after he had an opportunity to observe market movements.

---

[3] AT1s are contingent convertibles, meaning that they are a type of debt issued by a bank that can be converted into equity if its capital levels fall below certain requirements.

[4] Duration measures how sensitive the price of a bond or fixed-income portfolio is to changes in interest rates.

121.    Given the high liquidity of the Treasury derivatives that Leech traded, his trades frequently had substantial price movement between the time of trade and the time of allocation.

122.    With knowledge of the price movements of his trades, Leech disproportionately allocated trades at a first-day gain to Favored Portfolios and trades at a first-day loss to Disfavored Portfolios.

123.    The disparity in first-day performance between Favored Portfolios and Disfavored Portfolios was not the result of differences between the Macro Opps and Core and Core Plus strategies.

124.    Indeed, one portfolio within the Core Plus strategy received numerous preferential allocations alongside Favored Portfolios—indicating that trades allocated to Favored Portfolios were not inappropriate for Core or Core Plus by reason of strategy difference alone.

125.    Similarly, there are numerous dates on which Leech allocated trades to either Favored or Disfavored Portfolios, and also allocated trades in that same instrument "50/50" such that they were split between the Favored and Disfavored Portfolios—indicating that the trades specifically allocated to Favored or Disfavored Portfolios were not allocated in one direction by reason of strategy difference alone.

126.    Moreover, Leech's cherry-picked allocations to all the Strategies involved the same types of highly liquid Treasury derivatives.

127.    On numerous occasions during the Relevant Period, Leech traded the exact same instruments in the same direction at different prices over the course of a day and then allocated trades at a gain (or smaller loss) to Favored Portfolios and trades at a loss (or smaller gain) in whole or in part to Disfavored Portfolios.

128.    In other words, when faced with a favorable execution price in instruments and trades that apparently could have been allocated to either Favored Portfolios or Disfavored Portfolios on a given date, Leech often allocated trades with favorable execution to Favored Portfolios, rather than splitting trades among all the portfolios he managed or allocating them to Disfavored Portfolios.

129.    As an illustrative example, on June 17, 2021, Leech sold calls on thirty-year Treasury bonds multiple times. He allocated a trade at a strike of $159 per contract and a loss of more than $1,000,000 to Disfavored Portfolios. Later in the day, he allocated a trade at a strike of $160.50 per contract and a gain of approximately $35,000 split between Favored and Disfavored Portfolios. And he allocated a better trade—at a strike of $161 per contract and a gain of approximately $164,000—to Favored Portfolios.

130.    Similarly, on November 4, 2021, Leech sold thirty-year Treasury futures multiple times. He allocated a trade at a price of $161.50 per contract and a gain of approximately $85,000 to Favored Portfolios. Shortly thereafter, he split a trade at a worse price—$161.25— between Favored Portfolios and Disfavored Portfolios. He allocated an even worse trade—at a price of $160.25 per contract and a loss of approximately $357,000—to Disfavored Portfolios.

131.    Likewise, on March 17, 2022, Leech sold calls on ten-year Treasury futures multiple times. He allocated a trade at a strike of $126 per contract and a gain of approximately $319,000 to Favored Portfolios. Shortly thereafter, he allocated a worse trade—at a strike of $125.5 per contract and a loss of approximately $31,000—split between Favored Portfolios and Disfavored Portfolios.

132.    In some instances, Leech bought and sold the same instrument on the same date, thus locking in a realized gain or loss, and then disproportionately allocated trades at a realized gain to Favored Portfolios and trades at a realized loss to Disfavored Portfolios.

133.    For example, on July 6, 2022, Leech bought and sold ten-year Treasury futures multiple times. Leech's allocations resulted in approximately $200,000 in gains on intra-day trades to Favored Portfolios, and approximately $220,000 in losses on intra-day trades to Disfavored Portfolios.

134.    Likewise, on July 13, 2022, Leech bought and sold five-year Treasury futures multiple times. Leech's allocations resulted in approximately $2,200,000 in gains on intra-day trades to Favored Portfolios, and approximately $240,000 in losses on intra-day trades to Disfavored Portfolios.

135.    Similarly, on August 5, 2022, Leech bought and sold ten-year Treasury futures multiple times. Leech's allocations resulted in approximately $33,000 in gains on intra-day trades to Favored Portfolios and approximately $690,000 in losses on intra-day trades to Disfavored Portfolios.

136.    During the Relevant Period, Leech's Favored Portfolios enjoyed more than $600 million in realized and unrealized net first-day gains. By contrast, Disfavored Portfolios suffered more than $600 million in realized and unrealized net first-day losses.

137.    Although these first-day gains and losses were primarily unrealized (*i.e.*, the positions remained open rather than being sold off at the end of the day), they nonetheless benefitted Favored Portfolios and disadvantaged Disfavored Portfolios because they frequently permitted Favored Portfolios to end the day at a gain, and starting a trading position with a gain

rather than a loss ultimately increased the likelihood of Favored Portfolios' successful performance.

138.    During the Relevant Period, Favored Portfolios had 34 consecutive months of net first-day gains, whereas Disfavored Portfolios had net first-day losses in every month.

139.    During the Relevant Period, when specifically directing an allocation to either Favored Portfolios or Disfavored Portfolios, Leech allocated more than 90 percent of trades with more than $1 million in first-day gains to Favored Portfolios, and more than 90 percent of trades with more than $1 million in first-day losses to Disfavored Portfolios.

140.    Similarly, during the Relevant Period, when specifically directing an allocation to either Favored Portfolios or Disfavored Portfolios, Leech allocated more than 90 percent of trades with more than $500,000 in first-day gains to Favored Portfolios, and more than 90 percent of trades with more than $500,000 in first-day losses to Disfavored Portfolios.

141.    When Leech did not have the opportunity to cherry-pick, he was unable to replicate the remarkable success he experienced with allocations from Western Asset's omnibus accounts to Favored Portfolios.

142.    For example, as noted above, trades executed for Leech by Broker A generally were allocated to Macro Opps by default, meaning that Leech could not account for intraday price move when trades were allocated. During the Relevant Period, these trades—for which Leech's allocation discretion was limited—did not have a bias for first-day gains.

143.    Furthermore, in October 2023, Western Asset removed Leech's trading and allocation privileges in Disfavored Portfolios, which resulted in all his trades being allocated to Favored Portfolios.

144.    Between November 2023 and July 2024, Favored Portfolios' first-day performance decreased significantly, approximately breaking even, in contrast to their net positive returns in each of the 34 months of the Relevant Period.

**IV.    Leech's Conduct Was Materially Deceptive.**

145.    Leech did not disclose to his clients that trades with first-day gains would be, and repeatedly were, allocated to Favored Portfolios and trades with first-day losses would be, and repeatedly were, allocated to Disfavored Portfolios.

146.    As CIO, Leech would have been aware that his manner of allocating trades based on first-day performance contradicted Western Asset's disclosures to investors in its Forms ADV for the period 2019-2023 that "[i]nvestment allocations are done in a manner that Western Asset believes is fair and equitable, with the presumption that similarly situated clients should generally participate in similar investment opportunities and trades."

147.    Western Asset made other similar statements to clients about its allocation practices, including in responses to DDQs. Those statements likewise did not disclose Leech's practice of allocating trades based in part on first-day performance.

148.    In carrying out his scheme, Leech failed to act in his clients' best interests or to disclose to his clients all material facts of his trading—including that he was disproportionately directing better performing trades toward Favored Portfolios and away from Disfavored Portfolios and was not following the documented trade flow process that Western Asset shared with some investors.

149.    Leech's scheme was inherently deceptive because cherry-picking is virtually impossible for clients to detect on their own.

150.    That is, clients generally are unable to see how their adviser allocates trades and rely on their adviser to provide investment advice that is in clients' best interest, to prioritize clients' financial interests over the adviser's own, and to fully disclose all material facts.

151.    Leech's methodology of allocating trades was deceptive because it was based at least in part on an undisclosed metric; *i.e.* first-day performance.

152.    It would have been important to a reasonable investor to know that Leech, as the investment adviser, allocated trades based in part on first-day performance, did not allocate trades fairly and equitably, was not following Western Asset's documented trade flow process, and that Favored Portfolios were receiving certain better performing trades and Disfavored Portfolios were receiving certain worse performing trades.

**V.    Leech Evaded Detection of His Cherry-Picking Scheme.**

153.    During the Relevant Period, Favored Portfolios' AUM was just a small fraction of Disfavored Portfolios' AUM.

154.    For example, as of June 30, 2021, Macro Opps had approximately $13 billion in AUM, compared to approximately $166 billion in combined AUM for Core and Core Plus.

155.    As of September 30, 2022, Macro Oppos had approximately $5.7 billion in AUM, compared to approximately $118 billion in combined AUM for Core and Core Plus.

156.    The larger size of Disfavored Portfolios, along with what was typically a smaller proportional allocation of of Treasury derivatives in Disfavored Portfolio as compared to Favored Portfolios, made it more difficult to detect Leech's scheme.

157.    As a result of the asset composition and smaller size of Favored Portfolios, Leech's trades in Treasury derivatives often constituted a greater percentage of AUM in Favored Portfolios than in Disfavored Portfolios.

158.    Thus, Leech's trades at a first-day gain had a greater proportionate impact on Favored Portfolios than his trades at a first-day loss had on Disfavored Portfolios.

159.    Accordingly, the positive impact that Leech's fraudulent conduct had on Favored Portfolios was more noticeable within Western Asset than the negative impact of his conduct on Disfavored Portfolios.

**VI.    Leech Benefited from His Cherry-Picking Scheme.**

160.    Western Asset touted Macro Opps' performance to clients. For example, as reflected in notes from a February 2, 2021, meeting with an investor, Western Asset told the client that "the firm's overall value opportunities can be assessed through [the Macro Opps] strategy."

161.    As Macro Opps' creator and lead portfolio manager, Leech's professional reputation was also tied to the strategy's performance.

162.    For instance, in December 2021, Leech received accolades from Western Asset's CEO for achieving positive annual returns in a Macro Opps private fund. The CEO called the results a "fantastic outcome."

163.    Similarly, on April 1, 2023, the director of Western Asset's London operations sent Leech an email with the subject line "Re: MO [Macro Opps]" stating, "+4.63% YTD – nothing else comes close[.] Well done [K]en!!"

164.    As the lead portfolio manager of Macro Opps, Leech's cherry-picking allowed him to look like he had personally been making successful trading decisions.

165.    Leech also stood to benefit financially from his cherry-picking scheme because his incentive compensation at Western Asset was determined by the success of the portfolios he managed and the overall performance of the firm.

166.    As discussed above, due to differences in fee structures, every dollar of AUM in Macro Opps portfolios could generate approximately four times as much revenue for Western Asset as each dollar in Core and Core Plus portfolios.

167.    Thus, by allocating better-performing trades to Favored Portfolios that generated higher fees, firm revenue—and thereby Leech's incentive compensation—stood to increase.

168.    Between 2018 and 2020, when Western Asset was performing well, Leech's annual incentive compensation ranged from $28 to $30 million per year.

169.    In mid-2021, performance in Western Asset's funds began to falter. Consistent with the firm's performance, Leech's incentive compensation was reduced to $21 million in 2022.

170.    In 2021, as Western Asset's overall firm performance declined, Leech's cherry-picking increased dramatically, to the benefit of Favored Portfolios that earned higher revenue for the firm. Leech thereby increased his own potential incentive compensation through favorable trade allocations to portfolios in a strategy he controlled.

171.    In addition, Leech received a subset of his incentive compensation in a deferred compensation account invested in Western Asset funds.

172.    In 2023, while Leech was engaged in his cherry-picking scheme, he increased his deferred compensation amounts in the Macro Opps strategy and decreased his deferred compensation amounts in the Core and Core Plus strategies.

173.    Specifically, Leech reduced his deferred compensation account investment in portfolios in the Core and Core Plus strategies from approximately $19.4 million in January 2023 to approximately $5.6 million in March 2023. Leech further reduced it to approximately $143,000 by August 2023.

174.     And in March 2023—a single month in which Leech allocated trades with more than $100 million in net first-day gains to Favored Portfolios and more than $100 million in net first-day losses to Disfavored Portfolios—he increased his deferred compensation investment in Macro Opps portfolios from approximately $142,000 to approximately $19 million.

175.     In or around October 2023, Western Asset launched an internal investigation into certain past trade allocations involving treasury derivatives in select Western Asset-managed accounts.

176.     On August 21, 2024, Western Asset announced that Leech was on a leave of absence effectively immediately, which remains in effect as of the filing of this Complaint.

177.     Also on August 21, 2024, Western Asset announced that it had determined to close its Macro Opps strategy, and the fund was liquidated on October 29, 2024.

## FIRST CLAIM FOR RELIEF
## Violations of Section 17(a)(1) and (3) of the Securities Act

178.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 28 and 30 through 177.

179.     By engaging in the acts and conduct described in this Complaint with respect to the Funds, Defendant, directly or indirectly, singly or in concert with others, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly employed devices, schemes or artifices to defraud, and/or (2) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of such securities.

180.    The conduct described in this Complaint was in the offer or sale of securities because it coincided with sales of interests in the Funds to, and purchases of such interests by, investors in the Funds.

181.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1) and (3)].

**SECOND CLAIM FOR RELIEF**
**Violations of Section 10(b) and Rule 10b-5(a) and (c) Thereunder of the Exchange Act**

182.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 28 and 30 through 177.

183.    By engaging in the acts and conduct described in this Complaint with respect to the Funds, Defendant, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (1) employed one or more devices, schemes, or artifices to defraud, and/or (2) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

184.    The conduct described in this Complaint was in connection with the purchase or sale of securities because it coincided with sales of interests in the Funds to, and purchases of such interests by, investors in the Funds.

185.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

### THIRD CLAIM FOR RELIEF
### Violations of Sections 206(1) and (2) of the Advisers Act

186.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 177.

187.     At all relevant times, Western Asset and Defendant were investment advisers under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)]. Defendant owed Favored Portfolios and Disfavored Portfolios a fiduciary duty of utmost good faith and had an affirmative duty to make full and fair disclosure of all material facts, as well as a duty to act in their best interests.

188.     By engaging in the acts and conduct described in this Complaint, Defendant, directly or indirectly, singly or in concert, while acting as an investment advisor, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly has: (1) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud clients or prospective clients, and/or (2) knowingly, recklessly, or negligently engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients.

189.     By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, violated and, unless enjoined, will again violate Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### FOURTH CLAIM FOR RELIEF
### Violations of Section 36(a) of the Investment Company Act

190.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 24 and 30 through 177.

191.    The Registered Funds were each an "investment company" as defined by Section 3(a)(1) of the Investment Company Act [15 U.S.C. § 80a-3(a)(1)].

192.    Defendant served or acted within five years of the date of the filing of this action with respect to a registered investment company as an officer, director, member of an advisory board, investment adviser, depositor, or principal underwriter.

193.    By engaging in the acts and conduct described in this Complaint, Defendant, directly or indirectly, singly or in concert with others, engaged in an act or practice constituting a breach of fiduciary duty involving personal misconduct with respect to the registered investment company for which he served or acted.

194.    By reason of the foregoing, Defendant violated and, unless enjoined, will again violate Investment Company Act Section 36(a) [15 U.S. C. § 80a–35(a)].

### FIFTH CLAIM FOR RELIEF
### Violations of Section 37 of the Investment Company Act

195.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 24 and 30 through 177.

196.    The Registered Funds were each an "investment company" as defined by Section 3(a)(1) of the Investment Company Act [15 U.S.C. § 80a-3(a)(1)].

197.    By engaging in the acts and conduct described in this Complaint, Defendant, directly or indirectly, singly or in concert with others, stole, unlawfully abstracted, unlawfully and willingly converted to his own use or to the use of another, or embezzled moneys, funds, securities, credits, property, or assets of a registered investment company in violation of Section 37 of the Investment Company Act [15 U.S.C. § 80a-36].

198.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined will again violate, Investment Company Act Section 37 [15 U.S.C. § 80a-36].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

## I.

Permanently enjoining Defendant and his agents, servants, employees and attorneys and all persons in active concert or participation with him from violating, directly or indirectly, Securities Act Sections 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1) and (3)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rules 10b-5 thereunder [17 C.F.R. §§ 240.10b-5], Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and (2)], and Investment Company Act Sections 36(a) and 37 [15 U.S.C. §80a-35 and 36];

## II.

Permanently prohibiting Defendant from participating, directly or indirectly, including, but not limited to, through any entity owned or controlled by Defendant, in the purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities for his personal accounts;

## III.

Ordering Defendant to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), (d)(5), and (d)(7)];

**IV.**

Ordering Defendant to pay civil monetary penalties under Securities Act Section 20(d)

[15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], Section 209(e) of

the Advisers Act [15 U.S.C. § 80b-9(e)], and Section 42(e) of the Investment Company Act [15

U.S.C. § 80a-41(e)];

**V.**

Permanently prohibiting Defendant from serving as an officer or director of any company

that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that

is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to

Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C.

§ 78u(d)(2)]; and

## VI.

Granting any other and further relief this Court may deem just and proper.

### JURY DEMAND

The Commission demands a trial by jury.

Dated:  New York, New York
        November 25, 2024

Respectfully submitted,

 /s/ Andrew Dean
Andrew Dean
Brent Wilner*
Debra Jaroslawicz
Lindsey Keenan
Ronnie B. Lasky*
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
212-336-0142 (Jaroslawicz)
Email: JaroslawiczD@sec.gov
*Not admitted in the U.S. District Court for the S.D.N.Y.